# Peter A. Lorimier & Robert Waller, administrators of Abraham Wilson, deceased, *vs.* Samuel Lewis, et. al.

## *Error to Dubuque.*

In an action of forcible entry, it matters not that the plaintiffs themselves were trespassers. A trespasser may, under certain circumstances maintain this action against the legal owner.

The President of the United States has no power by virtue of his office, and independent of statutory authority, to lease the lead mines in Iowa.

There is no law in existance authorizing the President to lease the lead mines.

This was an action of forcible entry and detainer in the District Court of Dubuque county, on an appeal from a justice of the peace, where verdict and judgment had been rendered for the plaintiffs.

The following agreement was made by the parties:

" That the above case shall be submitted to the District Court aforesaid, at the present term, and the issues of law and fact submitted to the court.

" It is admitted that the *locus in quo*, is public land, belonging to the United States; that it has not been proclaimed for sale, or subject to private entry by any existing law of the United States. Upon the trial here, the plaintiffs admit that a lease of the lot in question was duly made and executed by John Flanagan, agent of the United States lead mines, to the defendants, (a copy of which is made part of this case) that the defendants entered under and by virtue of said lease.

" The plaintiffs further admit and agree, that the letters of appointment of the said Flanagan as agent of the lead mines, together with any and all instructions which said Flanagan may have received, in reference to leasing the lands within the mineral district or upper Mississippi, or north-west lead mines, whether from the President of the United States, the treasury, war or ordinance departments, may be received by the court as genuine, and coming from the public officers, from whom they purport to come. It is further agreed by the parties, that if the court shall be of opinion that the said John Flanagan had legal authority to grant said lease, then judgment is to be rendered for the defendants. But if the court shall be of opinion that said John Flanagan had no legal

authority to grant said lease, then the judgment rendered in the court of the justice of the peace to be affirmed.

"This agreement shall also extend to the admission of testimony in the Supreme Court of Iowa. It is understood that this agreement is not to operate as a waiver to the right of appeal, or suing out a writ of error by either party.

"TIMOTHY DAVIS, Attorney for plaintiffs.
"BERRY & WILSON, Attorneys for defendants."

The case was argued before the District Court, at February term, 1843, and the judge being of opinion that the right to lease the lead mines, as claimed, did not exist, the judgment was for the plaintiffs.

PER CURIAM, MASON, CHIEF JUSTICE.—This was an action of forcible entry and detainer, commenced before a justice of the peace, and brought by appeal into the District Court of Dubuque county. The case was submitted to that court on an agreed statement of facts, which although affording but an imperfect view of the whole matter, must constitute the only ground for a decision here.

It is admitted that the *locus in quo*, was public land belonging to the United States, and that the defendants entered under, and by virtue of a lease from the agent of the United States lead mines ; but the plaintiff's ground of action is not set forth ; nor whether they or any one else, were in possession of the lands at the time the aforesaid lease was executed. By mutual consent, the whole case is to turn upon one point ; the power of the President of the United States to authorize the granting of leases of this nature, for any or all lead mines on the west side of the Mississippi river.

It was contended in the course of the argument, that the plaintiffs below in this case, were themselves sheer trespassers, and much stress seemed to be laid on that circumstance. That fact however, is in no manner mingled with this case. The action is not ejectment, but forcible entry and detainer, and may be brought by a trespasser, even against the legal owner of the premises. All that is necessary to sustain this action is that the defendant should forcibly and illegally have turned the plaintiff out of possession.

Besides, the stipulations in the argument, make the whole to depend upon the right of the agent to lease, and we cannot travel beyond that agreement. Nothing is therein mentioned of the plaintiffs' being trespassers. We have therefore no data by which to ascertain the title of

the plaintiffs, nor if we had, would that be a proper subject of considera-
tion in this form of action.

It has been urged, that the President is vested with the power in
question, in consequence of the general supervision of the public lands,
with which he is by law entrusted.    Such a power however, should have
a more substantial basis.    It is not a branch of prerogative.    It should
not result from implication.    The right to lease the lead mines would
imply a like power in relation to all the other lands of the territory.    It
a lease for three years can be legally given, independent of statutory
authority, why not for fifty ?    And if the President can grant such leases,
Congress itself, can afterwards only dispose of the reversion.    Whole
States might thus have been peopled by a race of tenantry, holding, not
under the government, but under the executive.

Probably, from such views of the case, serious doubts have sometimes
been entertained, whether even Congress possesses the legitimate power
to authorize such leases.    The Supreme Court of the United States have
recently set this question at rest.    *United States vs. Gratiot, et al.* 14,
*Peters*, 526.

We feel no disposition to rebel against that decision.    We think
however, that in such cases, the constitutional powers of Congress is
exerted to its utmost tension, and that under such circumstances, no
power of this nature can exist independent of an unequivocal statute.
None should result from inference, or be obtained by loose construction.
If Congress either directly, or by a fair and reasonable construction of
any statute, have authorized the leasing of the lead mines in the manner
persued by the agent at Dubuque, the decision of the District Court
must be reversed ; otherwise not.

What authority then has been conferred by statute, to justify such
leasing ?    None has been pointed out, except that derived from two acts
of Congress, both passed March 3d, 1807.    One of these entitled " An
act making provision for the disposal of the public lands, situated
between the United States military tract, and the Connecticut reserve,
and for other purposes," authorizes the President to lease for a term not
exceeding five years, any lead mine, which has been, or may hereafter
be discovered *in the Indian territory.*    This act, so far from giving the
authority contended for, raises a strong inference against it, agreeably
to the maxim " *inclusio unius est exclusio alterius.*"*

The express power given to lease in the *Indian territory,* is local, and

---

* One being included, supposes an exclusion of the other.

inferentially withholds the like power to lease elsewhere. It also goes far to overthrow the position assumed in the argument, that the law having intrusted the President with a general supervision of the public domain, he possessed the power to lease the lead mines, in the absence of any express statute on the subject. If the executive was already vested with a general power of this nature, why should it be again conferred upon him in a particular case. By the passage of the act referred to, we have at least a legislative exposition of the law on this subject, independent of statute.

But reliance is chiefly placed upon the other statute referred to, bearing even date with the above mentioned. It is entitled "an act to prevent settlements being made on lands ceded to the United States, until authorized by law." The first section of that act, prescribes certain penalties and forfeitures, and in case of unauthorized settlements upon the public lands. The President is also empowered to direct the Marshal to remove intruders *and also to take such other measures, and to employ such military force as he may judge necessary and proper to effect such removal.* It is contended that in as much as the President is hereby authorized "to take such other measures" as he may judge necessary and proper, to remove intruders, he may make a lease for that purpose; that instead of ordering out the military force, he may lease the ground to some other citizen, and then leave the latter to remove the intruder by legal and peaceable means.

Such would be a most liberal construction of the statute, under any circumstances; but the reasoning would be much more plausible were it not for the absence of one essential fact. There is nothing to show that the lease in the present case, was given for any such purpose. It does not appear from the agreed statement of facts, that any person was upon the land when the lease was made to the defendants below. Admitting that the President would be authorized to employ this "measure" to remove a trespasser, could he anticipate the trespass, and lease the lands to prevent intrusion? Under the general authority to select his own measures to remove intruders, can he dispose of the whole public domain for an unlimited space of time, before yet a single intruder has set foot upon it? The proposition carries its own refutation; and yet if the position taken by the counsel for the defendants be tenable, we shall be irresistably driven to this sweeping conclusion.

The only remaining argument that we recollect to have heard urged for the plaintiffs in error, (though as we find no brief among the papers of the case, we may have forgotten some points,) is derived from the

power to lease, contained in the second section of the last mentioned statute. That section commences with a provision in favor of those who had settled on the public lands prior to that date—authorizing them to remain, upon making application to the proper land officer and complying with certain conditions therein prescribed, and concludes with the following proviso: " that in all cases where the tract of land applied for, includes either a lead mine, or salt spring, no permission to work the same shall be granted, without the approbation of the President of the United States, *who is hereby authorized to cause such mines or springs to be leased for a term not exceeding three years, and on such conditions as he shall think proper*." It is insisted on the one hand, that this proviso contains a general authority to lease mines and salt springs. This cannot be the proper construction of the statute. The authority herein contained must be explained by the context, the proviso by the subject matter of the section. That section relates entirely to the case of persons who were then upon the public lands—allows them to remain upon complying with certain requisites, unless the tract embraces a lead mine, or a salt spring; in which case, the approbation of the president is made necessary. Then comes the clause under consideration authorizing the President to lease "such mines and salt springs " for the term of three years. What mines and salt spring are here refered to? Clearly those located on tracts then occupied, and to the further occupancy of which the approbation of the President is made requisite.

This view of the matter is confirmed by the passage of the other statute already refered to. If the proviso we have been considering, was intended to confer a general power of leasing all lead mines and salt springs, could there be any necessity for other statute, giving the special power to lease *in the Indian territory*. These two acts were passed not only by the same Congress, but on the same day, and there is therefore the strongest necessity for giving them such a construction as to give effect to both. This will be best accomplished by regarding the one as local, and the other as applicable to all lands *then occupied*. The case at bar cannot be placed in a predicament to be affected by either of these statutes. We therefore conclude that there is no law to authorize the leasing of the lead mines within this territory.

Judgment below affirmed.